Brian S. King, #4610
Brent J. Newton, #6950
Samuel M. Hall, #16066
Andrew J. Somers, #19078
**BRIAN S. KING, P.C.**
420 East South Temple, Suite 420
Salt Lake City, UT 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com
brent@briansking.com
samuel@briansking.com
andrew@briansking.com

Attorneys for Plaintiffs

THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| ANNE L., and E.L., <br><br> Plaintiffs, <br><br> vs. <br><br> CIGNA HEALTH and LIFE INSURANCE COMPANY, UNITED HEALTHCARE INSURANCE COMPANY, UNITED BEHAVIORAL HEALTH, STARLING PHYSICIANS P.C., and the STARLING PHYSICIANS P.C. MEDICAL BENEFITS PLAN, <br><br> Defendants. | COMPLAINT |

Plaintiffs Anne L. ("Anne") and E.L., through their undersigned counsel, complain and

allege against Defendants Cigna Health and Life Insurance Company ("Cigna"), United

Healthcare Insurance Company, United Behavioral Health (collectively "United"), Starling

Physicians P.C. ("the Plan Administrator"), and the Starling Physicians P.C. Medical Benefits

Plan ("the Plan") as follows:

1

## PARTIES, JURISDICTION AND VENUE

1. Anne and E.L. are natural persons residing in Hartford County, Connecticut. Anne is E.L.'s mother.

2. Cigna and United acted as insurers and third-party claims administrators, as well as fiduciaries under ERISA for the Plan during the treatment at issue in this case.

3. United Behavioral Health is the mental health arm of United Healthcare Insurance Company and assisted in processing the relevant appeals and claims at issue in this case. Cigna also, at times, operated under the name Evernorth Behavioral Health.

4. At all relevant times either Cigna or United acted as agents for the Plan and the Plan Administrator.

5. Cigna was the third party administrator of the welfare benefit plan through December 31, 2021 ("the Cigna Plan"). As of January 1, 2022, coverage was provided through a plan insured by United ("the United Plan").

6. The Plan Administrator is the designated administrator for the Plan.

7. For the time frame Cigna was involved in the claims, the Plan was a self-funded employee welfare benefits plan under 29 U.S.C. §1001 *et. seq.*, the Employee Retirement Income Security Act of 1974 ("ERISA"). For the time United was involved in the claims, the Plan was a fully insured employee welfare benefit plan and was also governed by ERISA.

8. E.L. received medical care and treatment at Open Sky Wilderness Therapy ("Open Sky") from July 31, 2021, to October 27, 2021, and Solstice RTC ("Solstice") from October 28, 2021, to March 18, 2022. At the time treatment took place, these were treatment facilities located in San Juan County Utah and Davis County, Utah, respectively, which provided

sub-acute inpatient treatment to adolescents with mental health, behavioral, and/or substance abuse problems.

9. Cigna and United, acting on their own behalf or under the brand names Optum or Evernorth Behavioral Health, denied claims for payment of E.L.'s medical expenses in connection with her treatment at Open Sky and Solstice.

10. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

11. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Cigna and United each do business in Utah, United has a large claims processing facility in Salt Lake County where the claims and appeals relevant to this case were sent for processing, and the treatment at issue took place in Utah.

12. In addition, the Plaintiffs have been informed and reasonably believe that litigating the case outside of Utah will likely lead to substantially increased litigation costs they will be responsible to pay and that would not be incurred if venue of the case remains in Utah. Finally, given the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

13. The remedies the Plaintiffs seek under the terms of ERISA and under the Plan are for the benefits due under the terms of the Plan, and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA"), for an award of statutory damages against the Plan Administrator pursuant to 29 U.S.C.

§1132(c) based on the failure of the Plan Administrator and its agents, to produce within 30 days documents under which the Plan was established or operated, an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. §1132(g).

## BACKGROUND FACTS

### E.L.'s Developmental History and Medical Background

14. Towards the end of middle school, E.L. began to exhibit concerning behaviors such as isolating herself in her room. She had outbursts of anger and was resistant when rules or boundaries were set. Her parents found a journal in her room around this time which expressed dark thoughts about wanting to die.

15. E.L.'s parents also discovered evidence of her self-harming by cutting. She began meeting with a therapist regularly. Despite this intervention, E.L.'s isolation and emotional dysregulation escalated and she lost interest in activities which she used to enjoy.

16. E.L. saw various treatment professionals, but her condition did not improve. E.L. started abusing substances and on Thanksgiving Day in 2020 she vomited all over the car after consuming excessive amounts of alcohol. When confronted about this, E.L. threatened to run away and to hurt herself. That night she continued to use substances and was found to have self-harmed.

17. E.L. was taken to the hospital and began attending an intensive outpatient program after she was discharged. E.L. completed the program but showed little noticeable improvement. She made drastic changes to her appearance and she continued to engage in acts of self-harm and abuse substances.

18. E.L. was again hospitalized and again was placed in an intensive outpatient program after discharge. E.L. was resistant to the program and continued to act out. Following this treatment, E.L. met an older man online and attempted to sneak out and run away with him.

19. E.L.'s behaviors and substance use prevented her from functioning and in June of 2021 she drank so much that she vomited all over her bed in the middle of the night. The next month E.L. stole alcohol from a wedding and ran away when confronted. She was found at a relative's house hours later drinking even more alcohol.

20. She left the house and falsely yelled that her parents were hurting her. The police were called, and when they arrived found E.L. self-harming by banging her head against the ground. Her parents attempted to intervene and were attacked and her father was left with a black eye.

21. E.L. was handcuffed and was again hospitalized. E.L. refused to calm down at the hospital and had to be sedated. Following this inpatient hospital treatment, E.L. wa admitted to Open Sky.

**E.L.'s Treatment at Open Sky**

22. E.L. was admitted to Open Sky on July 31, 2021.

23. In a series of Explanation of Benefits statements, Cigna denied payment for E.L.'s treatment. Cigna relied on the following justifications for the denial:

> A0 - WE NEED MEDICAL RECORDS TO PROCESS THIS CLAIM. WE HAVE REQUESTED BUT NOT YET RECEIVED IT. WE'VE CLOSED THE CLAIM.

> A0 - YOUR PLAN BOOKLET LISTS THE SERVICES AND PROCEDURES COVERED BY YOUR PLAN. THE PLAN WILL ONLY PAY FOR SERVICES LISTED IN THE BOOKLET.

24. In a letter dated February 8, 2023, E.L.'s father ("Tom") submitted an appeal of the denial of payment for E.L.'s treatment.

25. Tom wrote that he was entitled to certain protections under ERISA during the appeal process, including a full, fair, and thorough review conducted by appropriately qualified reviewers whose identities were clearly disclosed, which took into account all of the information he provided, and which gave him the specific reasons for the adverse determination, referenced the specific plan provisions on which the denial was based, and which gave him the information necessary to perfect the claim.

26. He asked that the reviewer have experience treating individuals with E.L.'s diagnoses and that they be trained in the details of MHPAEA in order to respond to his concerns about a violation of the statute.

27. Tom wrote that he had reviewed the exclusions section of his benefits booklet and did not see any exclusions for the outdoor behavioral health treatment E.L. received. He wrote that this list instead included items such as cosmetic therapies, vocational counseling, and massage therapy, but had nothing relevant to E.L.'s treatment.

28. He argued that Open Sky met the definition of an "other health care facility" in his benefits booklet, as it was duly licensed by both Colorado and Utah and met the applicable governing state regulations. Tom further stated that Open Sky was nationally accredited and fully compliant with industry standards and clinical best practices.

29. Tom contended that E.L.'s treatment was medically necessary and satisfied the requisite plan terms. He wrote that Cigna appeared to be basing its determination on a proprietary "Complementary and Alternative Medicine" policy, however he argued that this policy was not applicable as it specifically stated that it was superseded by the terms of the

member's benefit booklet, which he again alleged did not exclude facilities like Open Sky.

30. Moreover, he noted that this Cigna policy specifically stated that it was intended to apply to billing codes T2036 and T2037 and made no reference to the 1006 revenue code used by Open Sky. He expressed further concern that Cigna's guidelines did not appear to apply to inpatient treatment at all, but only referenced outpatient care.

31. He quoted the definition of "Experimental Investigational, and Unproven Services" in his benefits booklet and argued that Open Sky did not meet this definition. He noted that this exclusion primarily dealt with services which had not been approved by the Food and Drug Administration, had not shown to be safe through peer-reviewed research, or were the subject of a clinical trial.

32. He argued that Open Sky met none of the conditions listed which would classify it as an experimental or investigational service and stated that outdoor behavioral health programs had been the subject of numerous peer reviewed research articles which showed that they were both safe and effective.

33. Additionally, he wrote that after extensive review these programs had been granted their own revenue code by the American Hospital Association and National Uniform Billing Committee back in 2016. He argued that no such revenue code would have been assigned if outdoor behavioral health programs were in any way experimental or unproven.

34. He asked how Cigna had determined outdoor behavioral health programs to be experimental and asked for the qualifications of the individual(s) who made that determination.

35. He included a letter from Dr. Michael Gass, an expert in the field of outdoor behavioral healthcare which argued among other things that Cigna had mischaracterized outdoor behavioral health programs and erroneously equated them with non-therapeutic programs such as military boot camps.

36. Dr. Gass stated that Cigna did not accurately define what treatment outdoor behavioral healthcare provided and mischaracterized studies to support its position while ignoring studies which contradicted its position. Dr. Gass argued that there was no "strong and evidence-based rationale" to support Cigna's position, and its decision to deny payment reflected its "lack of understanding on the topic."

37. Tom also included letters from external review organizations who had found when reviewing denials for other individuals that outdoor behavioral health services were not experimental or investigational but was instead consistent with generally accepted standards of medical practice.

38. Tom voiced his concern that Cigna was applying treatment limitations on outdoor behavioral health services which violated MHPAEA. He wrote that MHPAEA compelled insurers to ensure that benefits for mental health services were offered at parity with benefits for analogous medical or surgical services. He identified skilled nursing, subacute rehabilitation, and inpatient hospice facilities as some of the medical or surgical analogues to the treatment E.L. received.

39. Tom argued that Cigna's denial of payment for mental health services that met the plain terms of coverage as defined in his governing plan documents violated MHPAEA as it did not do this for analogous medical or surgical services. He asked that if he was

mistaken and Cigna also discriminated against medical or surgical providers in the same way he identified for the Open Sky treatment, that Cigna provide evidence of this.

40. He requested that Cigna perform a MHPAEA compliance analysis on the Plan to ensure it was operating in accordance with the statute. He asked to be provided with physical copies of any documentation related to this analysis.

41. Tom included a copy of E.L.'s medical records with the appeal and stated that he would provide any other necessary information upon request.

42. In addition Tom asked to be provided with a copy of all documents under which the Plan was operated, including all governing plan documents, the summary plan description, any insurance policies in place for the benefits he was seeking, any administrative service agreements that existed, any clinical guidelines or medical necessity criteria utilized in the determination (along with their medical or surgical equivalents, whether or not these were used), together with any reports or opinions regarding the claim from any physician or other professional, along with their names, qualifications, and denial rates (collectively the "Plan Documents").

43. Tom received no response to this appeal despite following up numerous times to inquire about the status and despite Cigna's obligation to respond within sixty days as stated in the Plaintiffs' benefit booklet.

44. During one of these calls, the Cigna representative falsely stated that Tom did not have the ability to submit an appeal for Open Sky as it was experimental and unproven and did not qualify for an appeal. The representative did not cite to any authority in the governing plan documents to support their contention that experimental or investigational denials could not be appealed.

**Solstice**

45. E.L. was admitted to Solstice on October 28, 2021.[1]

46. In a letter dated January 11, 2022, United denied payment for E.L.'s treatment at Solstice from January 7, 2022, forward. The letter stated that United's criteria were not met as:

> You are doing better. Your symptoms have improved. You are not suicidal or homicidal. You are taking your medications as directed.
>
> Care and recovery could continue in the Mental Health Partial Hospitalization Program setting.

47. On December 27, 2022, Tom and Anne submitted an appeal of United's denial of E.L.'s treatment. They asked United to respect their rights under ERISA and asked it to carefully review all the information they provided. They expressed concern that United had not referred to any clinical evidence to support its determination and asked for a copy of all documentation related to the decision to deny payment including any case notes or reports.

48. They wrote that the criteria United purported to have used were outdated and should not have been used as they had been discontinued in favor of the CALOCUS-CASII criteria. They asked that if the CALOCUS-CASII criteria were used in the future that they be provided with the scores and sub-scores used to inform the reviewer's decision.

49. They argued that E.L.'s treatment should have been approved under the CALOCUS-CASII and went through each requirement point by point in the criteria and illustrated how it had been met.

---

[1] A small portion of E.L.'s treatment at Solstice occurred during the time Cigna acted as third-party administrator for the Plan. Plaintiffs are only seeking compensation from United for the denied treatment at Solstice.

50. They argued that E.L. demonstrated unsafe behaviors, severe impulsivity, and poor judgment. They noted her history of substance use, self-harm, and of attempting to run off with an older man. They stated that she was at a high risk of victimization and had not been able to remain safe at home.

51. They contended that United's statements that E.L. was "doing better" and that her "symptoms have improved" were conclusory and ignored E.L.'s continued struggles while in treatment.

52. They argued that E.L.'s treatment was medically necessary and appropriate and included letters of medical necessity from E.L.'s treatment providers with the appeal. Rich Michaelson, CMHC wrote in part in a letter dated March 14, 2022:

> While at Solstice [E.L.] has been given a DSM-5 diagnosis of:
>
> 300.02 (F41.1) Generalized Anxiety Disorder
> 296.32 (F33.1) Major Depressive Disorder, Recurrent, Moderate
> 313.81 (F91.3) Oppositional defiant disorder
> 304.31 (F12.20) Cannabis Use Disorder, Moderate
> 303.90 (F10.20) Alcohol use disorder
> V61.20 (Z62.820) Parent-Child Relational Problems
> V15.59 (Z91.5) Personal history of self-harm
>
> While [E.L.] has made progress in all areas of functioning, it is believed that she would have been at very high risk of relapse had she returned to a less restrictive environment in October of last year. It is believed that she required additional time in a protective environment in order to continue progress and consolidate gains made.
>
> Solstice provides twenty-four hour supervision. Residents receive individual and family therapy totaling 3 hours every week. Residents participate in 8 to 10 hours of group therapy per week including equine therapy and DBT skills groups. The residents receive psychiatric monitoring. Additionally, residents participate in daily milieu therapy, in which therapeutic and behavioral concerns are addressed on an ongoing basis. Solstice specializes in treatment of trauma, with most of the clinical staff trained in EMDR and Brain Spotting. Staff are also well versed in working with stated disorders, Solstice also provides a rigorous daily structured program, with daily health and fitness activities.

Given her history, diagnosis, and behavioral issues prior to treatment, it is believed that residential was required to keep her safe and work on her issues. It is believed that if she is allowed to complete a stay in residential care, she has an excellent chance of learning and practicing coping mechanisms that will allow her to return home successfully, and will serve her throughout her life.

53. In a September 29, 2021, psychological evaluation Jennifer Brown, PsyD wrote in part:

As for the topic of next steps for [E.L.] after completing her program at Open Sky, she will need continued structure and supports in order to develop a healthier sense of self, engage in more consistent and genuine honesty, manage frustration and unhappiness in a healthier manner, develop healthy coping skills and manage sobriety. The most conservative course of action would be for her to transition to a structured. program such as a residential aftercare program that can continue to teach healthy coping with emotions, stress, and frustration, and support and ensure her sobriety. Longer term treatment is strongly recommended as [E.L.] is at significant risk for relapsing regarding not only her substance use, but also regarding her negative behaviors. Structure and consistency, as well as a caring and nurturing environment to help support [E.L.] make consistently better choices for herself will be important.

54. Kristen Bolt, MEd, LMFT, wrote in part in E.L.'s October 27, 2021, discharge summary from Open Sky:

It is recommended [E.L.] attend a Residential Treatment Center to support continued growth and success. [E.L.]'s parents chose Solstice RTC, in Utah.

It is recommended [E.L.] continue to participate in weekly individual and family therapy focused on the above treatment areas. Recommended areas of focus include: interventions aimed at reducing the symptoms of presenting diagnoses; developing healthy relationships with peers, adults and family; and developing a long-term plan to aid [E.L.]'s future success.

It is recommended parents participate fully in the family therapy components at aftercare program, including: family therapy sessions, parent workshops, therapeutic homework assignments for parents, etc.

It is recommended parents participate consistently in individaul [sic] and/or couple therapy during [E.L.]'s enrollment to support individual growth and parenting efficacy.

It is recommended [E.L.] receive academic accommodations in line with academic needs (see psychological evaluation and/or previous individualized education plan).

> It is recommended [E.L.] continue to work with a psychiatrist to monitor psychotropic medication regimen and assess for any necessary modifications (see specifics in corresponding section above).
>
> It is recommended [E.L.] and family continue to work with Thomas Callahan, their Educational Consultant, for assistance with ongoing therapeutic and academic needs

55. Tom and Anne wrote that all E.L.'s treating professionals agreed that treatment in a residential level was necessary and appropriate. They voiced concern that United would attempt to supersede the opinions of the medical professionals who had worked with E.L. on a firsthand basis and actively witnessed the deterioration of her conditions.

56. They stated that E.L. received treatment at Solstice which was not only safe but also effective, and allowed her to be able to receive safe and effective treatment at a lower level of care going forward.

57. They asked United to perform a MHPAEA analysis to ensure the Plan was compliant with the statute.

58. In a letter dated March 21, 2023, attributed to an "Appeal Representative" United upheld the denial of payment for E.L.'s treatment. The letter stated that the denial was maintained as:

> I've uphold [sic] a denial because Solstice RTC has been designated as not available for authorization because it offered noncovered services such as Wilderness Therapy. Based on the Optum Behavioral Clinical Policy Wilderness Therapy is considered unproven and not medically necessary for the treatment of emotional, addiction, and/or psychological problems. Evidence based treatment known to help your conditions was available.

59. On May 8, 2023, Tom and Anne submitted a second level one appeal of the denial of payment for E.L.'s treatment. They argued that they were entitled to another appeal as United had failed to comply with its obligations under ERISA and had switched to a new denial rationale without giving them an opportunity to respond.

60. They accused United of "stacking" denial rationales in the hope that at least one would stick. They reminded United that it had a fiduciary duty to act in their best interests and argued that United's conduct did not satisfy this burden.

61. They stated that they had not received the documentation they had requested and United had given no indication that it had performed the MHPAEA compliance analysis they asked for. They again asked for this to be done and expressed concern that United violated MHPAEA by "flagging" Solstice for automatic denial regardless of the medical needs of individual patients.

62. Tom and Anne argued that United's justification for denying payment was nonsensical and based on several errors. They pointed out that United stated that Solstice was unavailable for authorization, even though it *did* authorize the first six days of treatment for which it was responsible from January 1, 2022, through January 6, 2022.

63. They contended that Solstice was not a "wilderness" program but was a duly licensed residential treatment center. They pointed out that Solstice even referred to itself as Solstice RTC. They argued that because United's justification for denying care was "unfounded and irrelevant" it should reverse its decision to deny payment.

64. They argued that the reviewer was not qualified and, apart from basing their determination on incorrect information, was not even a practicing physician.

65. They reiterated that Solstice met the requirements listed in the terms of the Plan for coverage to be approved and was licensed by the state of Utah as a residential treatment facility. They further argued that E.L.'s treatment was medically necessary and similarly should have been approved. They again asked for a copy of the Plan Documents.

66. In a letter dated July 6, 2023, United wrote that Plaintiffs had exhausted all internal review options.

67. The letter did not address Plaintiffs' argument that Solstice was not a wilderness facility not did it address their other arguments.

68. As Plaintiffs had yet to receive the documentation they requested, they made one last request by sending a letter dated January 23, 2024, directly to the Plan Administrator. Anne asked to be provided with:

- Disclosure of the identities of all individuals with clinical or medical expertise who evaluated the treatment for my daughter, [E.L.], at Open Sky Wilderness Therapy and Solstice RTC, copies of those individuals' *curriculum vitae*, copies of any memoranda, emails, reports, or other documents reflecting the rationale of the reviewers in denying coverage for [E.L.]'s claim;
- A complete copy of both the medical necessity criteria utilized by Cigna and United Healthcare Insurance Company in determining that [E.L.]'s treatment was not medically necessary and that treatment for her at a lower level of care was appropriate;
- A complete copy of the medical necessity criteria utilized by the Plan for skilled nursing facilities, sub-acute inpatient rehabilitation treatment, and inpatient hospice treatment. This is necessary to allow me to carry out an evaluation of whether the Plan has complied with the requirements of the federal Mental Health Parity and Addiction Equity Act;
- Copies of documents identifying the self-compliance analysis the Plan and Cigna and United Healthcare Insurance Company have carried out to determine the extent to which they are complying with the federal Mental Health Parity and Addiction Equity Act.
- Complete copies of any and all internal records compiled by Cigna and United Healthcare Insurance Company and Starling Physicians in connection with [E.L.]'s claim including, but not limited to, telephone logs, memoranda, notes, emails, correspondence, or any other communications;
- A copy of the summary plan description, master plan document, certificate of insurance, insurance policy, and any other document under which [E.L.]'s insurance plan is operated;
- Copies of any and all administrative service agreements, contracts or other documents which described and defined the relationship, rights and obligations of and between you, the plan administrator, and Cigna and United Healthcare Insurance Company; and
- Copies of any and all documents outlining the level of accreditation required for residential treatment programs;

- Copies of any and all documents showing whether analogous levels of care to residential treatment programs also require these levels of accreditation; and
- Copies of documents identifying the process, strategies, evidentiary standards, or other factors the Plan used to determine that the treatment at Open Sky Wilderness Therapy and Solstice RTC was experimental and investigational.
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to determine whether treatment at sub-acute inpatient programs for medical or surgical treatment is experimental and investigational.
- Copies of documents identifying the processes, strategies, evidentiary standards, and other factors used to apply a nonquantitative treatment limitation with respect to medical/surgical benefits and mental health or substance use disorder benefits under the plan.

69. The Plaintiffs exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA as much as they were able given Cigna's failure to respond to the Open Sky appeal.

70. The denial of benefits for E.L.'s treatment was a breach of contract and caused Anne to incur medical expenses that should have been paid by the Plan in an amount totaling over $110,000.

**FIRST CAUSE OF ACTION**

**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B)
Against Cigna and United and the Plan)**

71. ERISA imposes higher-than-marketplace quality standards on insurers and plan administrators. It sets forth a special standard of care upon plan fiduciaries such as Cigna and United, acting as agents of the Plan, to discharge their duties in respect to claims processing solely in the interests of the participants and beneficiaries of the Plan. 29 U.S.C. §1104(a)(1).

72. Defendants failed to provide coverage for E.L.'s treatment in violation of the express terms of the Plan, which promise benefits to employees and their dependents for medically necessary treatment of mental health and substance use disorders.

16

73. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials and to engage in a meaningful dialogue with the Plaintiffs in the pre-litigation appeal process. 29 U.S.C. §1133(2).

74. The denial letters produced by Defendants do little to elucidate whether they conducted a meaningful analysis of the Plaintiffs' appeals or whether it provided them with the "full and fair review" to which they are entitled. Cigna failed to substantively respond to the issues presented in Anne's appeals and did not meaningfully address the arguments or concerns that the Plaintiffs raised during the appeals process.

75. In fact, Cigna failed to respond entirely to the Open Sky appeal, and United changed its denial rationale to a wilderness exclusion for a licensed residential facility with no wilderness component.

76. Cigna, United, and the agents of the Plan breached their fiduciary duties to E.L. when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in E.L.'s interest and for the exclusive purpose of providing benefits to ERISA participants and beneficiaries, to produce copies of relevant documents and information to claimants upon request, and to provide a full and fair review of E.L.'s claims.

77. The actions of Cigna, United, and the Plan in failing to provide coverage for E.L.'s medically necessary treatment are a violation of the terms of the Plan and its medical necessity and facility eligibility criteria.

78. While the presentation of alternative or potentially inconsistent claims in the manner that Plaintiffs state in their first, second, and third causes of action is specifically anticipated

17

and allowed under F.R.Civ.P. 8, Plaintiffs contend they are entitled to relief and appropriate remedies under each cause of action.

## SECOND CAUSE OF ACTION

### (Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3)
### Against Cigna, United and the Plan)

79. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA. The obligation to comply with both ERISA and MHPAEA is part of Cigna and United's fiduciary duties.

80. MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

81. MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C.§1185a(a)(3)(A)(ii).

82. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, medical management standards limiting or excluding benefits based on medical necessity; refusal to pay for higher-cost treatment until it can be shown that a lower-cost treatment is not effective; and restrictions based on geographic location, facility type, provider specialty, or other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(A), (F), and (H).

83. The criteria used by Cigna and United for the intermediate level mental health treatment benefits at issue in this case are more stringent or restrictive than the criteria the Plan applies to analogous intermediate levels of medical or surgical benefits.

84. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for E.L.'s treatment include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities.

85. When Cigna, United, and the Plan receive claims for intermediate level treatment of medical and surgical conditions, they provide benefits and pay the claims as outlined in the terms of the Plan based on generally accepted standards of medical practice.

86. Cigna and the Plan evaluated E.L.'s mental health claims using criteria that deviate from generally accepted standards of medical practice. This process resulted in a disparity because the Plan denied coverage for mental health benefits when the analogous levels of medical or surgical benefits would have been paid.

87. As an example of disparate application of medical necessity criteria between medical/surgical and mental health treatment, United's reviewers improperly utilized acute medical necessity criteria to evaluate the non-acute treatment that E.L. received.

88. United's improper use of acute inpatient medical necessity criteria is revealed in the statements in its denial letters such as "You are not suicidal or homicidal."

89. This improper use of acute inpatient criteria was a nonquantitative treatment limitation that cannot permissibly be applied to evaluate the sub-acute level of care that E.L. received. The Plan does not require individuals receiving treatment at sub-acute inpatient

19

facilities for medical/surgical conditions to satisfy acute medical necessity criteria to receive Plan benefits.

90. The treatment provided in an acute care environment is necessarily distinct from treatment provided in a non-acute environment. Utilizing acute criteria to evaluate a non-acute claim will result in a near universal denial of benefits, regardless of the medical necessity, clinical appropriateness, or nature of the treatment.

91. Cigna and United also denied E.L.'s treatment in large part on the basis that it was experimental or investigational. The National Uniform Billing Committee, the organization responsible for developing and issuing revenue codes for services, has assigned wilderness programs their own separate revenue code.

92. Plaintiffs are aware of no analogous medical or surgical facilities which have been assigned such a revenue code that are categorically excluded by Cigna on the basis that they are experimental or investigational.

93. Plaintiffs alleged that both Cigna and United flagged for automatic denial the programs at which E.L. was treated despite the fact that the services should have been covered under the language of the governing plan documents.

94. They asserted that Defendants did not do this for analogous medical or surgical facilities.

95. They asked for documentation to allege these violations of MHPAEA with more specificity but neither Cigna or United responded to the request or indicated that they had complied with Plaintiffs' request for a MHPAEA analysis.

96. In this manner, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the medical necessity criteria utilized by the Plan and Cigna, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for

mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

97. The violations of MHPAEA by Cigna and the Plan are breaches of fiduciary duty and give the Plaintiffs the right to obtain appropriate equitable remedies as provided under 29 U.S.C. §1132(a)(3) including, but not limited to:

(a) A declaration that the actions of the Defendants violate MHPAEA;

(b) An injunction ordering the Defendants to cease violating MHPAEA and requiring compliance with the statute;

(c) An order requiring the reformation of the terms of the Plan and the criteria utilized by the Defendants to interpret and apply the terms of the Plan to ensure compliance with MHPAEA;

(d) An order requiring disgorgement of funds obtained by or retained by the Defendants as a result of their violations of MHPAEA;

(e) An order requiring an accounting by the Defendants of the funds wrongly withheld by each Defendant from participants and beneficiaries of the Plan as a result of the Defendants' violations of MHPAEA;

(f) An order based on the equitable remedy of surcharge requiring the Defendants to provide payment to the Plaintiffs as make-whole relief for their loss;

(g) An order equitably estopping the Defendants from denying the Plaintiffs' claims in violation of MHPAEA; and

(h) An order providing restitution from the Defendants to the Plaintiffs for their loss arising out of the Defendants' violation of MHPAEA.

**<u>THIRD CAUSE OF ACTION</u>**

**(Request for Statutory Penalties Under 29 U.S.C. §1132(a)(1)(A) and (c)
Against the Plan Administrator)**

98. Cigna and United, acting as agents for the Plan Administrator, are obligated to provide to participants and beneficiaries of the Plan within 30 days after request, documents under which the Plan was established or operated, including but not limited to any administrative service agreements between the Plan, Cigna, and United, the medical necessity criteria for mental health and substance abuse, and medical necessity criteria for skilled nursing and rehabilitation facilities.

99. In spite of Anne's requests during the appeal process for Defendants to produce the documents under which the Plan was operated, Defendants repeatedly failed to produce to the Plaintiffs the documents under which the Plan was operated, including but not limited to any administrative service agreements between the Plan, Cigna, and United, the medical necessity criteria for mental health and substance abuse, and medical necessity criteria for skilled nursing and rehabilitation facility treatment within 30 days after they had been requested.

100. After Cigna and United repeatedly failed to provide these materials, Anne sent one final letter dated January 23, 2024 to Cigna, United, and the Plan Administrator again requesting the documents which she was statutorily entitled to receive upon request. Cigna, United, and the Plan Administrator did not comply with Anne's request for documents.

101. The failure of the Plan Administrator and its agents, Cigna and United, to produce the documents under which the Plan was operated, as requested by the Plaintiffs, within 30 days of the requests for ERISA documents provides the factual and legal basis under

29 U.S.C. §1132(a)(1)(A) and (c) for this Court to impose statutory penalties against the Plan Administrator up to $110 per day from 30 days from the date of each of these letters to the date of the production of the requested documents.

102.     In addition, Plaintiffs are entitled to an award of prejudgment interest pursuant to U.C.A. §15-1-1, and attorney fees and costs pursuant to 29 U.S.C. §1132(g)

WHEREFORE, the Plaintiffs seek relief as follows:

1.     Judgment in the total amount that is owed for E.L.'s medically necessary treatment at Open Sky and Solstice under the terms of the Plan, plus pre and post-judgment interest to the date of payment;

2.     Appropriate equitable relief under 29 U.S.C. §1132(a)(3) as outlined in Plaintiffs' Second Cause of Action;

3.     For an award of statutory penalties of up to $110 a day against the Plan Administrator after the first 30 days for each instance of the Plan Administrator and its agents Cigna and United's failure or refusal to fulfill their duties, to provide the Plaintiffs with the documents they had requested.

4.     Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

5.     For such further relief as the Court deems just and proper.

DATED this 30th day of July, 2024.

By     s/ Brian S. King
Brian S. King
Attorney for Plaintiffs

County of Plaintiffs' Residence:
Hartford County, Connecticut